THE STATE OF KANSAS, *ex rel. Fred S. Jackson, as Attorney-general,* v. DAVID E. BOWDEN.

No. 15,994.

SYLLABUS BY THE COURT.

1. INTOXICATING LIQUORS—*Duty of Officers to Notify County Attorney of Illegal Traffic.* To comply with section 2462 of the General Statutes of 1901, requiring the marshal and other police officers of a city having notice or knowledge of any violation of the prohibitory liquor law to notify the county attorney of the fact of such violation and to furnish him the names of the witnesses by whom such fact can be proved, it is not sufficient that the officer should merely talk occasionally

The State v. Bowden.

with the county attorney in a general way about police court liquor prosecutions. The notification should be given in such a manner that the county attorney may know the communication is official, and in such terms that he will be put in possession of the specific information it is designed to convey.

2. ——— *Same.* The fact that violations of which police officers have knowledge are committed by men and women, white and colored, in their homes and at temporary places, where there are no bars and where liquor selling is not carried on as a business, so that they merit the epithet of "migratory," does not excuse failure to notify the county attorney.

3. ——— *Same.* The fact that the county attorney may be of the opinion that such cases are not of sufficient importance to warrant state prosecutions does not excuse failure to notify him of them.

4. ——— *Same.* Notifying the county attorney of violations of the law is just like any other regular police business. The purpose is the efficient suppression and certain punishment of crime, and to accomplish this purpose the county attorney must be notified as soon as the due and orderly discharge of police duty will permit.

5. QUO WARRANTO—*Office and Officers—Judicial Discretion.* The court has some discretion in granting and refusing relief in actions of *quo warranto,* which it may exercise according to the peculiar facts of individual cases.

Original proceeding in *quo warranto.* Opinion filed April 10, 1909. Judgment for the defendant.

### STATEMENT.

THIS is an original proceeding in *quo warranto,* brought by the state to oust the defendant from the office of chief of police of the city of Kansas City. A commissioner was appointed to take the evidence and make findings of fact. His report, to which no exception is taken, follows:

"(1) David E. Bowden was appointed and commissioned as chief of police or city marshal of Kansas City, Kan., April 9, 1907, and has held that office continuously since that date.

"(2) The police court in said city, between the dates April 9, 1907, and May 16, 1908, the date of filing the

petition in this case in this court, tried thirty-seven cases against various parties involving the charges of vagrancy, maintaining a nuisance, and selling liquor, in which the defendants were found guilty in all but one case. A table of such cases, with certain facts in connection therewith, is hereto attached and marked 'Exhibit A' and made a part of these findings.

"(3) At the trial of about one-half of these cases Chief Bowden was present in police court and heard the evidence. He was also present at the time of the raid upon the house of Maggie Marshall, on June 21, 1907, when he found a case of beer in the cellar, which was taken to police headquarters. On June 27, 1907, he assisted in breaking open a shed on North Fifth street, where C. Mathews had placed six cases of beer, which were confiscated and taken to headquarters. There was no evidence of selling in connection with this. On November 21, 1907, he knew of the seizure of beer by the officers going in boats to a room at 276 Central street, during the flood, when Al DeGraw was arrested and convicted.

"(4) After consultation with the police judge, Chief Bowden ordered or knew of paroles, stays to leave town and pardons in the cases of W. J. Murray, Ed Burke, H. C. Mack, Wm. Murray, Cynthia Harris, Ella Hobson, Maggie Marshall, Mary Cannon and E. Cannon, as will be seen by reference to table of cases attached, 'Exhibit A.'

"(5) Mr. Bowden had several conversations, dates not given, but commencing shortly after his term of office began, in which these liquor prosecutions were talked over in a general way with the county attorney, referring to the fact that the places had been raided, the party operating brought to trial in police court, and sentenced. The county attorney did not deem the cases of sufficient importance to prosecute in the name of the state, and the county attorney understood that, if there was a case that would be proper, in the judgment of the prosecuting attorney, to take charge of and prosecute in the name of the state, Mr. Bowden was there, ready and willing to furnish any information desired. But these conversations did not arise from visits to the county attorney by Mr. Bowden for the purpose of giving information in regard to the violations of the prohibitory liquor law.

"(6) The ordinances of Kansas City, Kan., require

the city marshal to keep in his office a proper book in which shall be entered the name of every person arrested for any violation of the ordinances of the city, the nature of the offense with which he is charged, the date of the commitment and discharge of all persons committed to the city prison, and directing that no person so committed should be discharged before serving out the full time for which he was committed, except upon the written order of the mayor, all of which records were kept as provided by the ordinances.

"'The city marshal by such ordinances is given control over the city jail and all persons sentenced to imprisonment therein for the violation of any ordinance.

"(7) Chief Bowden was notified by a special policeman appointed by the mayor of several places where it was said that liquor was being sold. He also received information by telephone and by letter of a similar character. These places he investigated, either personally or through the members of the police force, with reasonable diligence. In many places nothing was found, but in some beer was seized and taken to headquarters.

"(8) The defendant, Bowden, did not know that the law required him to report concerning the violations of the prohibitory liquor law to the county attorney until in May, 1908, a few days before this suit was begun in the supreme court of the state.

"(9) Shortly after May 11, 1908, defendant Bowden furnished the county attorney of Wyandotte county, Kansas, and the assistant attorney-general in said county, with a list of the cases tried, officers making the arrests, and witnesses in the thirty-four cases shown in 'Exhibit B' of the evidence, being the same subject-matter set out in 'Exhibit A' of these findings of fact. On September 20, 1908, he mailed to the county attorney eight reports covering the period from June 12, 1908, to September 14, 1908, and again on December 10, 1908, he made a further report to the county attorney of seven additional cases. He made no other written reports to the county attorney or to the assistant attorney-general.

"(10) The reports, 'Exhibit B' of the evidence, referred to in finding 9 above, were made at the request of defendant Bowden, by the police clerk, from a docket kept by him and the police court docket. They were made from arrest slips turned in to him by the captain

of the police sergeants. The arrest slips were made by the sergeants of the different stations and transmitted to headquarters. Of many of the facts stated in this letter to the county attorney, 'Exhibit B' of the evidence, the chief of police, Bowden, had no personal knowledge other than that they were the records made by officers under his control.

"(11) The arrests shown in 'Exhibit A' of these findings were made under an ordinance of Kansas City, Kan., known as the 'tippling-shop' ordinance. Defendant Bowden, previous to his appointment as chief of police, had never been connected with the police department in' any capacity. Shortly after his appointment he was taken ill and spent a week or two at Excelsior Springs. He had also been seriously ill at other times during the year.

"(12) The evidence does not disclose that any of the arrests shown in 'Exhibit A' of these findings were made at places where there was any established bar or room where liquor selling was carried on as a business. So far as disclosed by the evidence these violations of the law were by men and women, both white and colored, in their homes and in temporary places, where small quantities of liquor were kept for sale. Some of the arrests show no sales, the evidence being that beer was found in the cases in cellars, coal-houses and shacks of various kinds, and well merited the epithet of 'migratory,' applied by the county attorney.

"(13) Of the cases named in 'Exhibit A' of these findings, eighteen were appealed to the district court. None of them was ever tried in the appellate court. The cases of Maggie Marshall (No. 14,692), Lizzie Giles (No. 15,202), Bud Patterson (No. 15,535), Mollie Connors (No. 16,387) and James Hogan (No. 16,393) were dismissed in the district court by the city attorney. Nothing was done to enforce the original police court sentences in these cases. There is no evidence that mandates were sent down to the police court upon the dismissal of these cases in the district court."

"On January 29, 1909, I met C. W. Trickett, assistant attorney-general, attorney for plaintiff, and H. S. Dean and Ralph Nelson, attorneys for defendant, at Kansas City, Kan., and made the following

AMENDMENTS TO FINDINGS OF FACT:

"In finding No. 3, after the word 'this' in the ninth [eleventh] line, amend so as to read: 'Or in the Mar-

shall case. In July, 1908, defendant knew of the seizure of beer by the officers going in boats to a room at 276 Central street, during the flood, where Al DeGraw's place was.'

"In finding No. 13 change is made so that the whole finding reads as follows: 'Of the cases named in 'Exhibit A' of these findings eighteen were appealed to the district court. None of them was ever tried in that court. In the cases of Maggie Marshall (No. 14,692), Lizzie Giles (No. 15,202), Bud Patterson (No. 15,535), Mollie Connors (No. 15,387) and James Hogan (No. 16,393) the appeals were dismissed in the district court, but nothing was done to enforce the original police court sentence in these cases. The mandates were not sent down to the police court upon the dismissal of these appeals.' "

"Exhibit A" referred to in the findings gives the numbers of the police court cases, the names of the defendants, some of whom appear more than once, the dates of the arrests, the charges preferred, the names of the arresting officers, the names of the officers who were witnesses, the sentences imposed, and some other information.

*Fred S. Jackson,* attorney-general, and *C. W. Trickett,* assistant attorney-general for Wyandotte county, for The State.

*S. R. Nelson, D. C. McCombs, John A. Hale, H. E. Dean,* and *Richard J. Higgins,* for the defendant.

The opinion of the court was delivered by

BURCH, J.: Much space is taken up in the statute-book with laws regulating the sale of intoxicating liquors for lawful purposes, prohibiting and punishing sales for unlawful purposes, and suppressing and punishing the maintenance of liquor nuisances. The county attorney of each county is required diligently to prosecute all violations of these laws, and for failure of duty in this respect he may be removed from office.

Section 2462 of the General Statutes of 1901 is a part of this scheme of laws, and reads as follows:

"It shall be the duty of all sheriffs, deputy sheriffs, constables, mayors, marshals, police judges, and police officers of any city or town having notice or knowledge of any violation of the provisions of this act, to notify the county attorney of the fact of such violation, and to furnish him the names of any witnesses within his knowledge by whom such violation can be proven. If any such officer shall fail to comply with the provisions of this section, he shall upon conviction be fined in any sum not less than one hundred nor more than five hundred dollars; and such conviction shall be a forfeiture of the office held by such person, and the court before whom such conviction is had shall, in addition to the imposition of the fine aforesaid, order and adjudge the forfeiture of his said office. For a failure or neglect of official duty in the enforcement of this act, any of the city or county officers herein referred to may be removed by civil action."

The primary purpose of this provision is to put the county attorney in command of evidence whereby the law may be vindicated. The presumption is that he will do his duty. Sometimes, however, the county attorney displays masterly inactivity in the enforcement of the liquor-law, and then the diligent and faithful making of reports to him by the officers named may either compel him to act or furnish ground for his removal.

The law was framed to accomplish results. Its letter and spirit are unmistakable to any one who carefully studies it. When the defendant took office he bound himself to fulfil both. The findings are conclusive that he had knowledge of many violations of the law and knew the names of the witnesses by whom such violations could be proved. The record he was required to keep and the arrest slips turned in by his subordinates gave him notice of the fact of other violations. He did nothing except to talk with the county attorney in a general way about the subject of liquor prosecutions by the city. This is not what the statute requires. The notification must be given in such a manner that the

county attorney may understand it is an official communication, and in such terms that he will be put in possession of the specific information which it is designed to convey. The opinion of the county attorney respecting the importance of the class of cases discussed with him was not a lawful guide to the defendant's conduct. The county attorney is given no authority to grade violations of the law and thus create a standard of duty for police officers. Nor could the defendant and the county attorney agree upon any policy to be pursued which would displace the statute. The statute fixes the standard and settles the policy which must be observed.

The fact that the cases within the defendant's knowledge were sporadic, or, as they are termed, "migratory," is immaterial. The statute does not recognize the classification. They were violations of the law, and if a policeman know the facts it is his simple duty to notify the county attorney.

In communities where persistent efforts to evade the law are persistently opposed the liquor traffic is usually reduced to the degenerate state described in finding No. 11, and to what is known as "bootlegging." The law is not satisfied until such violations are punished. When detected by police officers they must be reported to the county attorney with promptitude or successful state prosecutions become impossible. Notifying the county attorney is just like any other regular police business. The purpose is the efficient suppression and certain punishment of crime. Unqualified diligence and celerity are always necessary to accomplish this purpose. Manifestly the making of weekly or monthly or quarterly reports is insufficient. The county attorney must be notified just as soon as the due and orderly discharge of police duty will permit.

It should not be inferred from what has been said that the county attorney must prosecute indiscriminately every kind of a case brought to his attention, even though, under the circumstances, and considering the evidence available, he has no reasonable prospect of se-

curing a conviction.   As the law officer of the county
he possesses some discretion, to be exercised candidly
and honestly in individual instances.   But police officers
have no discretion with reference to the classes of cases
they should report.

Such being the clear law of the case, the question is
whether the defendant should be ousted from office.
There is no finding of corruption or of wilful disobedi-
ence of the statute.,  The defendant was without police
experience when he undertook his office, was ignorant
of the law, and has suffered from ill health.   From a
showing made in response to a cost order it appears he
is a poor man, and his term ends in a few days.   He
has been ready and willing to do his duty, but the atti-
tude of the county attorney toward the class of cases
with which he has had to deal seems to have misled
him.   The parole of prisoners and the enforcement of
police court sentences have nothing to do with the case.
Ignorance of the law does not exculpate, nor does ill
health, unless it incapacitates from duty; but all the cir-
cumstances of the defendant's situation may be con-
sidered in connection with his motives, which plainly
enough are not dishonest, and so may influence the dis-
cretion which the court may exercise over the ex-
traordinary remedy of *quo warranto*.   That the court
has such discretion, see *Tarbox v. Sughrue*, 36 Kan.
225; *Weston v. Lane*, 40 Kan. 479; *Horton v. Wilder*,
48 Kan. 222, 226; *City of Topeka v. Water Co.*, 58 Kan.
349; *The State, ex rel., v. Wilson*, 30 Kan. 661, 671.

It is difficult to say what will best satisfy the de-
mands of justice in the premises, but under all the facts
the court is of the opinion that judgment should be ren-
dered in favor of the defendant, and it is so ordered.

JOHNSTON, C. J., (dissenting) :  A positive provision ·
of statute has been violated by the defendant, and for
such violation the legislature in its discretion has pre-
scribed the penalty of removal from office.   I doubt the
power of the court to interpose its discretion as against

that of the legislature and thus relieve the defendant from the consequences of his misconduct. Although there are some extenuating circumstances in the defendant's case, I do not feel warranted in deciding that the court can overlook the violations of statute that have been established, nor in holding that the defendant may continue to hold the office forfeited by such violations.